733 A.2d 372

**Jacqueline MANIKHI**

v.

**MASS TRANSIT ADMINISTRATION, et al.**

No. 1482, Sept. Term, 1998.

Court of Special Appeals of Maryland.

July 19, 1999.

498

500

502

504

Elizabeth Colette, Baltimore, for appellant.

Kathleen J. Masterton, Asst. Atty. Gen. and J. Joseph Curran, Jr., Atty. Gen., Baltimore, for appellees, MTA, Moragne-el and Parsons.

H. Victoria Hedian, Paul D. Starr and Abato, Rubenstein and Abato, P.A., on the brief, Baltimore, for appellees, Pettus, Fonder and Zollicoffer.

Callista M. Freedman and Paul F. Newhouse, Towson, on the brief for appellee, Ovid.

Argued before WENNER, EYLER and THEODORE G. BLOOM (Retired, specially assigned), JJ.

EYLER, Judge.

On March 14, 1997, Jacqueline Manikhi, appellant, filed a complaint in the Circuit Court for Baltimore City against multiple defendants, alleging violations of her civil rights, various State torts, and other claims. One of the defendants filed a motion to strike the complaint pursuant to Rule 2–303, and all defendants filed motions to dismiss the complaint pursuant to Rule 2–322(b). The motions to dismiss set forth in detail why the complaint failed to state a cause of action. At the hearing on the motions, held on September 17, 1997, the hearing judge granted the motion to strike, observing that she "was up around page 40—something, and [her] question was 'So what are the causes of action?'"[1] Appellant was given leave to file an amended complaint, and on October 6,

---

1. The docket entries indicate that, prior to this hearing, the case was removed to the U.S. District Court for the District of Maryland but was remanded back to the circuit court. According to the transcript of the September 17, 1997 hearing in circuit court, the U.S. District Judge, in ordering the remand, characterized the drafting of the complaint as "painful and outrageous."

1997, appellant filed an amended complaint with an attached 50–page affidavit. The defendants, appellees herein, the Mass Transit Administration (MTA), Roy Ovid, Vernon Parsons, Wade Moragne-el, Charles Pettus, Ennis Fonder, and Nelson Zollicoffer, in official and individual capacities, filed motions to dismiss or in the alternative for summary judgment. Some of the appellees moved to strike the affidavit.

The circuit court granted the appellees' motions to strike the affidavit and motions to dismiss, with the exception of a battery claim against appellee Ovid in his individual capacity. The rulings were announced in open court, and appellant did not request further leave to amend.[2] The trial of the battery claim began on April 27, 1998, and resulted in a verdict and judgment in favor of appellee Ovid on April 30, 1998. Appellant noted an appeal to this Court and challenges portions of the judgment granting the motions to dismiss.

### Allegations of the Amended Complaint

In essence, appellant alleged the following in the amended complaint. Appellant is a female African American and was employed by the MTA beginning in 1989. In 1991, she began working in MTA's Kirk Avenue shop as an "A–Cleaner" and was responsible for cleaning vehicles. Appellant worked the night shift. Ovid, "a male of African descent from Columbia, South America," also worked as an A–Cleaner on the night shift during the relevant time period. Appellant was physically and verbally abused by Ovid from 1991 to 1995. The amended complaint detailed numerous acts by Ovid, including allegations that he touched appellant in a sexually and physically abusive manner, that he exposed himself to her, and that

---

**2.** Appellant's failure to request further leave to amend is not surprising in view of her assertion that, prior to filing the original complaint, the subject matter of this case had been the subject of an internal MTA investigation and a criminal proceeding against Ovid. Presumably, all or most of the relevant information either was within her personal knowledge or became known to her by virtue of the prior proceedings before she initiated this action.

he verbally teased her and threatened to perform various acts of violence against her.

Parsons, a male Caucasian, was employed by the MTA at the Kirk Avenue location during the relevant time period and was appellant's superior. Moragne-el, a male African–American, was chief superintendent at the Kirk Avenue location beginning in 1995. The amended complaint alleged that both Parsons and Moragne-el had knowledge of the harassment but did nothing to stop it and instead condoned and encouraged Ovid's conduct. Appellant further alleged that the "last straw" occurred on October 11, 1995, when appellee Ovid elbowed her and called her a "bitch." On October 13, 1995, appellant filed a sexual harassment complaint with the MTA, which was resolved in her favor on December 8, 1995. In 1996, appellant transferred to another location in order to get away from the unlawful conduct and took a lower position as a "B–Cleaner," which allowed her to work alone. In approximately August, 1996, appellee Ovid was criminally convicted based on his harassment of appellant, and the conviction was reduced to probation before judgment after Ovid attended counseling.

Pettus, a male African–American, was president of the Amalgamated Transit Union, Local 1300, of which appellant was a member. Fonder, a male African–American, was recording secretary of Local 1300, and Zollicoffer, a male African–American, was a Local 1300 official during the relevant time period. The amended complaint alleged that Pettus, Fonder, and Zollicoffer condoned and encouraged the abuse; that MTA knew or should have known of the conduct but did nothing to stop it; and that the co-defendants protected Ovid.

Appellant alleged the following in specific counts:

Count I—battery against Ovid;

Count II—false imprisonment against Ovid;

Count III—aiding and abetting against all defendants;

Count IV—civil conspiracy against all defendants;

Count V—discriminatory harassment/hostile work environment in violation of Title VII, 42 U.S.C. § 2000e against the MTA;

Count VI—retaliation in violation of Title VII, 42 U.S.C. § 2000e against the MTA;

Count VII—deprivation of rights secured by the federal constitution in violation of 42 U.S.C. § 1983 against the individual defendants;

Count VIII—a conspiracy to deprive appellant of her civil rights because of racial and class-based animus in violation of 42 U.S.C. § 1985(3) against the individual defendants;

Count X[3]—a conspiracy to interfere with justice in state courts in violation of 42 U.S.C. § 1985(2) against Ovid, Parsons, and Moragne-el;

Count XI—criminal acts of violence against appellant motivated by gender in violation of 42 U.S.C. § 13981 against Ovid, Parsons, and Moragne-el;

Count XII—violations of due process, equal protection, and free speech under Articles 24 and 40 of the Maryland Declaration of Rights against the individual defendants;

An unnumbered count—intentional infliction of emotional distress against all defendants;

Count XIII—slander against Ovid and Moragne-el.

## Questions Presented

Appellant presents the following questions, which we have rephrased in part:

1. Did the circuit court err in dismissing appellant's Title VII discrimination claims against her employer, MTA?

2. Did the circuit court err in dismissing appellant's discrimination claims under 42 U.S.C. § 1983 and equal protection claims under Article XXIV of the Maryland Declaration of

---

3. There was no Count IX in the amended complaint.

Rights against individuals Ovid, Parsons, Moragne-el, Pettus, Fonder, and Zollicoffer?

3. Did the circuit court err in dismissing appellant's false imprisonment claim against Ovid?

4. Did the circuit court err in dismissing appellant's 42 U.S.C. § 13981 Gender Motivated Violence Act claim against Ovid, Parsons, and Moragne-el?

5. Did the circuit court err in dismissing appellant's intentional infliction of emotional distress, aiding and abetting, and civil conspiracy claims against the MTA, Ovid, Parsons, Moragne-el, Pettus, Fonder, and Zollicoffer?

On appeal, appellant presents no argument with respect to the battery claim in Count I, the 42 U.S.C. § 1985 claims in Counts VIII and X, the Article 40 and remaining Article XXIV violations alleged in Count XII, or the slander claim in Count XIII. Consequently, those claims are not properly before us.

Finally, appellant challenges—in footnote 4 of her brief—the circuit court's decision to strike the affidavit that was attached to and incorporated in the amended complaint. The lower court stated that it would strike the affidavit because it was a "regurgitation" of material in the original complaint that the court had labeled "outrageous" and "totally unnecessary" and that had prompted the court to strike the original complaint. Before this Court, appellant's argument in support of the affidavit does not address the valid central legal concern with the material: that it does not comply with Rule 2–303(b), prohibiting "argument ... or any immaterial, impertinent, or scandalous matter" in a pleading. We therefore deem the point waived and affirm this aspect of the lower court's order. Consequently, we do not consider the contents of the affidavit in answering the questions presented.

### Standard of Review

A motion to dismiss tests the legal sufficiency of the pleadings. *Bobo v. State,* 346 Md. 706, 709, 697 A.2d 1371 (1997); *Popham v. State Farm Mut. Ins. Co.,* 333 Md. 136, 140 n. 2, 634 A.2d 28 (1993). In reviewing a motion to dismiss for

failure to state a claim upon which relief can be granted, we must assume "the truth of all well-pleaded facts, as well as the reasonable and logical inferences which may be drawn therefrom." *Popham*, 333 Md. at 140 n. 2, 634 A.2d 28. *See also Board of Educ. v. Browning*, 333 Md. 281, 286, 635 A.2d 373 (1994); *Faya v. Almaraz*, 329 Md. 435, 443, 620 A.2d 327 (1993). The pleader must allege facts with specificity, and this Court need not consider wholly conclusory charges in a complaint. *See Bobo*, 346 Md. at 708–09, 697 A.2d 1371; *Berman v. Karvounis*, 308 Md. 259, 265, 518 A.2d 726 (1987). Further, "any ambiguity or uncertainty in the allegations bearing on whether the complaint states a cause of action must be construed against the pleader." *Ronald M. Sharrow, Chartered v. State Farm Mut. Auto. Ins. Co.*, 306 Md. 754, 768, 511 A.2d 492 (1986). *See also Bobo*, 346 Md. at 709, 697 A.2d 1371; *Popham*, 333 Md. at 140 n. 2, 634 A.2d 28; *Browning*, 333 Md. at 286, 635 A.2d 373. Dismissal is only proper if, after the allegations of the complaint are construed in this light, the facts and allegations in the complaint would fail to afford the plaintiff relief if proven. *See Bobo*, 346 Md. at 709, 697 A.2d 1371; *Browning*, 333 Md. at 286, 635 A.2d 373.

## Discussion

Appellant, in the amended complaint, apparently attempted to remove much of the material that was held to have been improperly included in the original complaint in violation of Rule 2–303(b). Nevertheless, as explained below, when we apply the standard of review to the amended complaint, we conclude that it remains substantively deficient, and we affirm the judgment.

### 1.

The circuit court dismissed the Title VII claims in the amended complaint on two alternative grounds: that the court lacked jurisdiction over the claims because the claims were subject to mandatory arbitration under Maryland Code (1993 Repl.Vol.), Transportation § 7–602; and that the allegations of the amended complaint were insufficient to state a

Title VII cause of action. With respect to its jurisdiction, the circuit court ruled that it lacked subject matter jurisdiction over all claims asserted against the MTA, namely, the Title VII hostile work environment and retaliation claims, as well as the State law aiding and abetting, civil conspiracy, and intentional infliction of emotional distress claims. Appellant contests the circuit court's decision to dismiss each of these claims. Therefore, as an initial matter, we shall discuss the circuit court's jurisdiction over the subject matter of the claims against the MTA.[4]

As we mention in footnote 4, *supra*, a circuit court has jurisdiction over individual claims if it has "the *power* to

---

4. In announcing in open court the reasons for its decision that it lacked jurisdiction over appellant's claims against the MTA, the circuit court stated that the claims were subject to arbitration both under the provisions of § 7–602 of the Transportation article and pursuant to appellant's collective bargaining agreement with the MTA. The court also stated that it would dismiss the claims on the alternate ground that they were barred by sovereign immunity. In the pertinent part of its written order dismissing the claims against the MTA, however, the court gave only "lack of subject matter jurisdiction" as a reason.

We interpret the court's written order, dismissing the amended complaint for lack of subject matter jurisdiction, to encompass only a potential legislative deprivation of jurisdiction in the circuit court by operation of § 7–602 of the Transportation article. The effect of the terms of appellant's collective bargaining agreement, or of any sovereign immunity from suit that the MTA might enjoy, could not find expression in a dismissal for jurisdictional reasons. On the issue of a circuit court's subject matter jurisdiction, the Court of Appeals has stated, "If by that law which defines the authority of the court, a judicial body is given the *power* to render a judgment over that class of cases within which a particular one falls, then its action cannot be assailed for want of subject matter jurisdiction." *First Federated Commodity Trust Corp. v. Commissioner of Securities*, 272 Md. 329, 335, 322 A.2d 539 (1974) (citing *Fooks' Ex'rs v. Ghingher*, 172 Md. 612, 622–23, 192 A. 782 (1937)). As a court of general jurisdiction, the circuit court has the power to render a judgment in an action in which a defendant alleges either sovereign immunity or the existence of a collective bargaining agreement through which the plaintiff allegedly has waived his or her right to litigate certain claims in court. Of the orally stated reasons for its decision regarding its own jurisdiction, only § 7–602 can be construed as a limitation of the power of the circuit court to hear certain claims. Consequently, we credit the circuit court's dismissal of appellant's claims against the MTA for lack of subject matter jurisdiction solely to the perceived jurisdictional effect of § 7–602.

render a judgment over that class of cases within which a particular one falls." *First Federated Commodity Trust Corp. v. Commissioner of Securities,* 272 Md. 329, 335, 322 A.2d 539 (1974) (citing *Fooks' Ex'rs v. Ghingher,* 172 Md. 612, 622–23, 192 A. 782 (1937)). The circuit courts of this state are courts of general jurisdiction with the power to adjudicate Title VII claims and State law torts subject to limitations on that jurisdiction that may be imposed by law. *See* Md.Code (1998 Repl.Vol.), Cts. & Jud. Proc. § 1–501. We therefore consider whether the arbitration provision of § 7–602 of the Transportation article limits the jurisdiction of the circuit court to render a judgment on any of appellant's claims against her employer, the MTA.[5]

Section 7–602, entitled, "Arbitration in labor disputes," provides in part:

(a) *"Labor dispute"* defined.—In this section, "labor dispute" is to be construed broadly and includes any controversy as to:

(1) Wages, salaries, hours, or other working conditions;

(2) Benefits, including health and welfare, sick leave, insurance, pension, or retirement provisions;

(3) Grievances that arise; or

---

**5.** We note that agreements to arbitrate, as distinguished from statutorily mandated arbitration that is final and binding, do not affect jurisdiction, but instead are construed as waivers of the rights of the parties to litigate in court. In *Anne Arundel County v. Fraternal Order,* 313 Md. 98, 108–09, 543 A.2d 841 (1988), the Court of Appeals quoted with approval the following reasoning of the Minnesota Supreme Court:

[T]here appears never to have been any factual basis for holding that an agreement to arbitrate "ousted" jurisdiction. It has no effect upon the jurisdiction of any court. Arbitration simply removes a controversy from the arena of litigation. It is no more an ouster of judicial jurisdiction than is compromise and settlement or that peculiar offspring of legal ingenuity known as the covenant not to sue. Each disposes of issues without litigation. One no more than the other ousts the courts of jurisdiction. The right to a jury trial, even in a criminal case, may be waived. So, also, may the right to litigate be waived. Such waiver may be the result of contract or unilateral action.

*Park Constr. Co. v. Independent Sch. Dist. No. 32,* 209 Minn. 182, 296 N.W. 475, 477 (1941).

(4) Collective bargaining agreements, including:

(i) The making or maintaining of any collective bargaining agreement;

(ii) The terms to be included in it; or

(iii) Its interpretation or application.

(b) *Unresolved labor dispute to be submitted to arbitration board.*—If, in a labor dispute between the [MTA] and any employees . . ., collective bargaining does not result in agreement, the [MTA] shall submit the dispute to an arbitration board.

. . . .

(d) *Majority determination is final and binding.*—A majority determination of the board is final and binding on all disputed matters.

The MTA argues that appellant's discrimination claims under Title VII and common law intentional tort claims each constituted a "labor dispute" between appellant and the MTA that was subject to binding arbitration under the statute—arbitration that would be final on all disputed matters. The MTA asserts that the term "labor dispute" is to be construed broadly and that each of appellant's claims in essence alleged a labor dispute as to "working conditions," "grievances," or issues regarding the "interpretation or application" of a collective bargaining agreement (CBA). Thus, the MTA argues, the circuit court properly dismissed appellant's claims against it because the claims were never submitted to arbitration.

 Appellant's Title VII claims in the amended complaint, however, do not seek an express ruling on the interpretation or application of her CBA,[6] and the plain language of § 7–602 suggests that the statute was never intended to mandate arbitration of the types of claims that appellant makes against the MTA. To the extent that the scope of the term "working conditions" in § 7–602(a)(1) is ambiguous, the doctrine of *ejusdem generis* confines its meaning to the class

---

6. Indeed, no party has included a copy of the CBA in the record before this Court.

of items described by the immediately preceding enumeration. *See, e.g., In re Wallace W.,* 333 Md. 186, 190–91, 634 A.2d 53 (1993) (discussing the rule of *ejusdem generis* ); *Smith v. Higinbothom,* 187 Md. 115, 130, 48 A.2d 754 (1946) (same). Thus, we construe the term "working conditions" to be limited to conditions in the nature of wages, salaries, and hours— conditions that define the work to be performed and the compensation to be paid.

 Similarly, there is no indication in the groups of controversies listed under § 7–602(a) that the term "Grievances," even if construed broadly, was intended to preclude litigation between the MTA and its employees that is based on federal civil rights legislation and Maryland common law intentional torts. If the Legislature had intended to confine all conceivable litigation between the MTA and its employees to arbitration, there would be no need to enumerate several particular categories of potential disputes. Additionally, to the extent that § 7–602 is in derogation of the common law of Maryland, the statute must be strictly construed. *See Sears, Roebuck & Co. v. Gussin,* 350 Md. 552, 562, 714 A.2d 188 (1998). We conclude that, absent clear language to the contrary, the Legislature did not intend to confine Title VII and intentional tort actions between the MTA and its employees to arbitration. Consequently, the circuit court had jurisdiction over appellant's claims against the MTA.

As we discuss in the remainder of Part 1 and in Part 5 of this opinion, however, we agree with the circuit court's alternate determination that appellant's amended complaint failed to allege any cognizable claims against the MTA.

### A. Title VII—Hostile Working Environment

 Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (1994). Sexual harassment is a form of sex discrimination under Title VII. *See Meritor Sav.*

*Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In addition to prohibiting sexual harassment that is explicitly tied to the grant or denial of an economic *quid pro quo,* Title VII prohibits sexual harassment that creates a work environment that is sufficiently hostile or abusive to affect a term, condition, or privilege of employment. *See Meritor Sav. Bank, FSB,* 477 U.S. at 67, 106 S.Ct. 2399. For hostile environment sexual harassment to be actionable, the harassment must be severe or pervasive. *Id. See also Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, ——, 118 S.Ct. 2257, 2264, 141 L.Ed.2d 633 (1998) ("The principal significance of the distinction is to instruct that Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment and to explain the latter must be severe or pervasive.").

 An actionably hostile work environment may be created by the sexual harassment of an employee by a co-employee. *See* 29 C.F.R. § 1604.11(d) (1998); *Spicer v. Virginia, Dept. of Corrections,* 66 F.3d 705, 708, 710 (4th Cir.1995) (en banc); *Wilson v. Southern Nat'l Bank,* 900 F.Supp. 803, 806, 809–10 (W.D.N.C.1995), *aff'd,* 92 F.3d 1184 (4th Cir.1996). *Cf. Wall v. AT & T Technologies, Inc.,* 754 F.Supp. 1084, 1091 (M.D.N.C.1990) (Title VII racial discrimination case). To plead such a cause of action successfully, the plaintiff must allege "(1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." *Spicer,* 66 F.3d at 710. *See also Hartsell v. Duplex Prods., Inc.,* 123 F.3d 766, 772 (4th Cir.1997). In *Katz v. Dole,* 709 F.2d 251 (4th Cir.1983), the Fourth Circuit discussed at length the fourth requirement above:

> Except in situations where a proprietor, partner or corporate officer participates personally in the harassing behavior, the plaintiff will have the additional responsibility of demonstrating the propriety of holding the employer liable under some theory.... We believe that in a "condition of

work" [i.e., hostile work environment] case the plaintiff must demonstrate that the employer had actual or constructive knowledge of the existence of a sexually hostile working environment and took no prompt and adequate remedial action. The plaintiff may do this by proving that complaints about the harassment were lodged with the employer or that the harassment was so pervasive that employer awareness may be inferred.

709 F.2d at 255 (citations omitted). The Fourth Circuit further explored this standard in *Spicer, supra,* stating, "When presented with the existence of illegal conduct, employers can be required to respond promptly and effectively, but when an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well." *Spicer,* 66 F.3d at 711.

We conclude that the allegations of appellant's amended complaint, when construed in accordance with the applicable standard of review, fail to satisfy the pleading requirements under the fourth element of a hostile environment claim. Assuming that appellant appropriately alleged that she was a victim of sexual harassment by her co-worker, Ovid, appellant fails to allege facts from which the MTA could be held liable for Ovid's harassment.

We note initially that several of the factual allegations of the amended complaint are irrelevant, repetitive, conclusory, and ambiguous. Our review of the pleading to glean support for appellant's Title VII hostile environment claim yields the following factual allegations. Appellant and Ovid were both "A–Cleaners" for the MTA at the Kirk Avenue location. Ovid subjected appellant to sustained verbal abuse of a sexual nature from 1991 to some time in 1996, with the exception of a period of time from 1993 to early 1994, when appellant had temporarily transferred to another work location "to escape the unlawful conduct against her." During this time, Ovid also physically abused appellant by "thrusting his penis in her

thigh," grabbing her breast and arms, and elbowing her.[7] At some time prior to 1996, unidentified union co-workers retaliated against appellant for being a "snitch," and spray painted "Jackie is a fink" and "Jackie is a rat" inside the wash house at the Kirk Avenue work site.

The Chief Supervisor of Kirk Division at the time of the spray painting incident apologized for the incident and stated that those responsible for it would be disciplined. This supervisor did nothing further about the incident, however, and disregarded "complaints about Defendant Ovid." Appellant at some point in time complained "about Defendant Ovid" to Night Foreman Vernon Parsons. Parsons did nothing in response to these complaints. At some point, appellant was crying in the lunch room because of something Ovid had said to her, when Parsons entered and jokingly said to appellant, "did your boyfriend Defendant Ovid [sic] do something to upset you?" At another point in time, Parsons asked appellant if she was peeping or spying on Ovid, and that Ovid said she was.

Appellant further alleged that the "last straw" occurred on October 11, 1995, when Ovid elbowed her and called her a "bitch." Apparently, on October 13, 1995, she filed an internal complaint with the MTA based on claims of sexual harassment, and the internal complaint was resolved in her favor on December 8, 1995.[8] On October 15, 1995, Wade Moragne-el, Chief Superintendent of Kirk Division as of 1995, confronted appellant in the yard in front of other employees. Moragne-el stated that if appellant did not resolve her differences with Ovid she would be terminated. Moragne-el further stated that he believed appellant had harassed Ovid because Ovid

---

7. Our conclusion that the amended complaint fails to state a claim against the appellees makes it unnecessary to consider the preclusive effect of the jury verdict against appellant on her battery claim.

8. We have set these occurrences in 1995 based on other references to the occurrences in the amended complaint. Paragraph 13 of the amended complaint actually states, "On or about Thursday October 13, 1997, Ms. Manikhi filed a sexual harassment EEO complaint internally with the MTA which was resolved in her favor on December 8, 1996."

refused to have sex with her. Appellant also asserted that several co-workers, Parsons, Moragne-el, and the union appellees all attempted to dissuade her from taking formal action against Ovid. Appellant does not specifically allege that any incidents of sexual harassment occurred after the favorable resolution of her internal complaint.

■ The factual averments of the amended complaint are insufficient to allege sexual harassment by any MTA employee other than Ovid. The alleged conduct of appellant's superiors, while possibly demeaning and unhelpful, does not constitute discrimination because of appellant's sex. Further, the specific allegations of sexual harassment all predate the resolution of appellant's internal complaint. While we are not given information relating to the specific actions taken by the MTA on the internal complaint, the amended complaint states that the procedure was resolved in appellant's favor. There are no facts, therefore, that the MTA's response to appellant's formal complaint was less than legally adequate under the rule in *Spicer, supra.* Consequently, we shall focus on the sufficiency of the pre-internal complaint allegations to support the inference that Ovid's harassment of appellant was so pervasive that the MTA could be charged with awareness of it before appellant invoked the formal internal complaint procedure.

■ Appellant's account of her previous supervisor's notice of the graffiti in the wash house does not support notice of sexual harassment. It is clear that only harassment related to the plaintiff's gender is actionable as sex discrimination. *See Hartsell,* 123 F.3d at 772. The spray painted slurs are not sexual in nature, and appellant does not allege that the slurs were in retaliation for, or otherwise related to, sexual harassment complaints voiced by her. Appellant does not even allege that Ovid was the subject of an informal complaint by her at that time, or that the incident was in any way related to her contact with Ovid. The statement by appellant's supervisor that those responsible for the spray painting incident would be disciplined does not demonstrate that he had notice of severe or pervasive sexual harassment by Ovid. At a subsequent

point in the complaint, appellant alleges that she complained to the same supervisor "about Defendant Ovid," but that those complaints were disregarded. The nature of this complaint is not specified.

Moreover, appellant's specific statements informing Moragne-el of the harassment occurred on October 15, 1995—after appellant had filed an internal complaint but before it was resolved in her favor. It is not disputed that the MTA had notice of appellant's complaints at this time.

Finally, the taunting comments Parsons allegedly made to appellant simply do not provide notice to the MTA of a hostile work environment. The comments are presented in a conversational context within which Parsons engages in verbal horseplay or teasing that is only tangentially based on appellant's sex. The statements themselves do not indicate that Parsons had knowledge of unwelcome severe or pervasive sexual harassment by Ovid. The comments, like the general statement that appellant complained to Parsons "about Defendant Ovid," are more consistent with a general animosity between appellant and Ovid. In any event, appellant does not allege a single instance in which she or anyone else told Parsons that Ovid was sexually harassing her. *Cf. Harris v. L & L Wings, Inc.*, 132 F.3d 978, 982 (4th Cir.1997) (employer charged with notice of hostile work environment where, in the absence of a formal internal complaint procedure, plaintiffs made repeated, specific complaints to several managers, and company President must have witnessed graffiti and pornography covering the walls of the workplace).[9]

The amended complaint describes a torrent of sexual harassment of which MTA had no notice prior to appellant's formal complaint. But the amended complaint is conspicuously devoid of specific allegations of harassment subsequent to

---

**9.** Given our conclusion that the amended complaint does not allege that Parsons had notice of a sexually hostile work environment prior to the events surrounding the internal investigation, we do not decide the ultimate issue whether notice to Parsons of such a hostile work environment would also satisfy the notice requirement with respect to the MTA.

the resolution of appellant's internal complaint. For these reasons, appellant's amended complaint fails to state a Title VII hostile work environment claim against the MTA.

### B. Title VII—Retaliation

Appellant argues that the amended complaint stated a *prima facie* case of retaliation under Title VII. Appellant points to allegations that, after she filed the internal complaint, the union appellees told her that she should omit some allegations against Ovid, that they agreed with Moragne-el and Parsons that she "would lose a day's work," that Moragne-el told her to reconcile her differences against Ovid or she would be terminated, and that some time in 1996 she took a lower paying position at another location "to get away from unlawful conduct against her."

To establish a cause of action for retaliation in violation of Title VII, a plaintiff must prove that she "engaged in a protected activity, that she suffered an adverse employment action, and that the two were causally related." *Glover v. South Carolina Law Enforcement Div.*, 170 F.3d 411, 413 (4th Cir.1999). Once this is done, the burden shifts to the employer to show that there was a non-discriminatory reason for the adverse employment action, and, if this is done, the burden shifts back to the plaintiff to show that the employer's reason is pretextual. *See Munday v. Waste Management of N. America, Inc.*, 126 F.3d 239, 242 (4th Cir.1997). The requirement of an adverse employment action focuses "on the question whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting and compensation." *Settle v. Baltimore County*, 34 F.Supp.2d 969, 987 (D.Md.1999) (quoting *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.1981) (en banc)). We find the above statements of the law persuasive.

Appellant's retaliation claim fails because she does not allege that the MTA took an adverse employment action

against her.[10] First, the allegations regarding actions of the union appellees are irrelevant to appellant's retaliation claim, which is made against the MTA alone. Second, in alleging that the union appellees agreed with Moragne-el and Parsons that appellant would lose a day of work, appellant does not mention whether this agreement was carried out, whether appellant was denied compensation for a day of work, or when any such action took place. We note that Title VII retaliation does not reach mediate decisions but extends only to ultimate employment decisions. *See, e.g., Munday*, 126 F.3d at 243 (supervisor's conduct in failing to address employment related complaints of the plaintiff, yelling at the plaintiff, and telling others to ignore and spy on her, did not amount to adverse employment action because plaintiff's complaints were addressed, investigated, and corrected by other agents of the employer). The amended complaint asserts that the internal complaint was resolved in appellant's favor, and, as we mention above, the amended complaint thereafter is devoid of specific allegations of harassment or retaliation. Finally, appellant's decision to transfer to another work location and accept a lower paying job is similarly based on a general allegation that, despite the favorable resolution of her internal complaint, appellant had to get away from the "unlawful conduct against her." We decline to construe these ambiguities in appellant's favor and hold that the amended complaint fails to state a claim for retaliation under Title VII.

### 2.

#### A. Claims Based on 42 U.S.C. § 1983

Appellant asserted claims against Ovid, Parsons, Moragne-el, and the union appellees, pursuant to 42 U.S.C. § 1983. Count VII of the amended complaint provides in part:

61. Paragraphs 1–60 and 72–99 are incorporated by reference as though set forth herein.

---

**10.** The amended complaint also fails to allege a causal connection between a protected activity and an adverse employment action.

62. Defendants Ovid, Parsons, Moragne-el, Pettus, Fonder, and Zollicoffer, acting in their individual capacities under color of state law, deprived Ms. Manikhi of her rights to be free from discrimination based on gender, race or ethnicity, secured by the Constitution and laws of the United States.

The remaining paragraphs of Count VII contain factual allegations and a demand for compensatory and punitive damages, as well as fees and costs, based on the violations of appellant's rights as asserted in paragraph 62.

The statute 42 U.S.C. § 1983 imposes civil liability on anyone "who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (1994). Section 1983 is not a source of substantive right but a method of obtaining redress for violations of federally created rights. *See Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Nicholson Air Servs., Inc. v. Board of County Comm'rs*, 120 Md.App. 47, 83, 706 A.2d 124 (1998). "The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.' " *Baker*, 443 U.S. at 140, 99 S.Ct. 2689.

Appellant, in her brief, predicates the § 1983 claim on violations of her equal protection rights under the Fourteenth Amendment to the Constitution. Appellant cites authority for the proposition that § 1983 provides a remedy for "discrimination in violation of [her] equal protection rights." Appellant further asserts that "[t]he elements of an employment discrimination claim in violation of the equal protection clause are the same under section 1983 as Title VII."

We do not address the latter of appellant's claims because we conclude she did not plead a violation of the Equal Protection Clause of the Fourteenth Amendment. The perti-

nent phrase in paragraph 62 asserts a violation of "rights to be free from discrimination based on gender, race or ethnicity, secured by the Constitution and laws of the United States." For support, Count VII incorporates the entire remainder of the amended complaint. Despite such broad incorporation, we are unable to locate any references to the Fourteenth Amendment or its Equal Protection Clause in the amended complaint. Consequently, we conclude that the pleading does not assert a violation of appellant's equal protection rights under the Constitution. Additionally, if the amended complaint is read to assert § 1983 remedies based on direct violations of the federal statutory counts, those § 1983 remedies fail as a result of our decision to affirm the dismissal of the predicate federal law counts.

### B. Claims Based on the Maryland Declaration of Rights

Although the amended complaint is silent with respect to appellant's federal equal protection rights, in Count XII it mentions the corresponding State right to equal protection secured by Article 24 of the Maryland Declaration of Rights.[11] Count XII of the amended complaint incorporates all other paragraphs of the pleading and asserts that the individual appellees "deprived Ms. Manikhi of Rights secured by the Maryland Declaration of Rights, including ... equal protection of the laws ... under Article[ ] 24."

Article 24 of the Maryland Declaration of Rights provides:

That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

Md.Code (1981 Repl.Vol.), Const. Art. 24. Although Article 24 does not guarantee equal protection in express terms, the concept of equal protection is embodied within the due process

---

11. Count XII also asserted violations of appellant's State constitutional rights "to due process for the protection of property and liberty," and "to free speech." Appellant does not contest the dismissal of these claims.

provisions of Article 24. *See Kirsch v. Prince George's County,* 331 Md. 89, 96–97, 626 A.2d 372 (1993); *Murphy v. Edmonds,* 325 Md. 342, 353, 601 A.2d 102 (1992).

In general, the Court of Appeals has looked to United States Supreme Court opinions interpreting the Fourteenth Amendment to the federal Constitution in analyzing like provisions of the Maryland Constitution and Declaration of Rights. *See Kirsch,* 331 Md. at 97, 626 A.2d 372. The two constitutional protections are distinct. They are "possessed of independent animation," such that "the application of Article 24 ... may require a result at variance with the Supreme Court's application of the fourteenth amendment's equal protection clause." *Murphy,* 325 Md. at 383, 601 A.2d 102 (Chasanow, J., dissenting) (quoting *Attorney General v. Waldron,* 289 Md. at 714 n. 20, 426 A.2d 929). Additionally, different principles govern the recovery of compensatory damages for violations of the state and federal constitutions. *Ashton v. Brown,* 339 Md. 70, 100, 660 A.2d 447 (1995); *Ritchie v. Donnelly,* 324 Md. 344, 368–74, 597 A.2d 432 (1991). While a violation of Article 24 gives rise to a private cause of action for damages under Maryland common law, *see DiPino v. Davis,* 354 Md. 18, 50 & n. 7, 729 A.2d 354 (1999); *Brown,* 339 Md. at 102–08, 660 A.2d 447; *Ritchie,* 324 Md. at 368–74, 597 A.2d 432; *Clea v. City of Baltimore,* 312 Md. 662, 679, 541 A.2d 1303 (1988); *Widgeon v. Eastern Shore Hosp. Ctr.,* 300 Md. 520, 537–38, 479 A.2d 921 (1984); *Dunne v. State,* 162 Md. 274, 284–85, 159 A. 751 (1932); *Weyler v. Gibson,* 110 Md. 636, 653–54, 73 A. 261 (1909) (discussing Article 23 of the Maryland Declaration of Rights, predecessor to present Article 24), the corresponding federal remedy is conferred by the statute 42 U.S.C. § 1983.

But, especially with respect to the development of equal protection jurisprudence, the Court of Appeals has virtually adopted Supreme Court precedent as controlling authority in the interpretation of corresponding State constitutional law. In *Murphy, supra,* Judge Eldridge wrote for the Court:

While the Equal Protection Clause of the Fourteenth Amendment and the equal protection guarantee embodied

in Article 24 of the Maryland Declaration of Rights are obviously independent and capable of divergent application, we have consistently taken the position that the Maryland equal protection principle applies in like manner and to the same extent as the Equal Protection Clause of the Fourteenth Amendment.[12] Thus, United States Supreme Court opinions concerning the Equal Protection Clause of the Fourteenth Amendment are practically direct authorities with regard to Article 24 of the Declaration of Rights.

*Murphy,* 325 Md. at 354, 601 A.2d 102 (citations and internal quotation marks omitted).

In drawing the line, however, between discrimination by State actors that violates Maryland equal protection guarantees and private discrimination beyond the reach of such guarantees, the Court of Appeals has not employed the Supreme Court's "state action" jurisprudence. Instead, the Maryland right to equal protection generally is violated by "public officials" acting "under color of their office." *Brown,* 339 Md. at 102–03, 660 A.2d 447. *See also Ritchie,* 324 Md. at 369, 597 A.2d 432; *Dunne,* 162 Md. at 285, 159 A. 751. Recently, the Court stated that only "government agents" can violate provisions of the Maryland constitution. *DiPino,* 354 Md. at 51, 729 A.2d 354. A review of the cases discussing violations of Maryland due process or equal protection principles by individual actors, however, reveals that the official status of the actor, and whether the official was acting under color of his office, was not at issue in any of the cases. *See DiPino,* at 23, 729 A.2d 354 (local police officer); *Brown,* 339 Md. at 102–04, 660 A.2d 447 (local police officers); *Ritchie,* 324 Md. at 349, 597 A.2d 432 (Sheriff of Howard County); *Clea,* 312 Md. at 664–65, 541 A.2d 1303 (Baltimore City Police Officer); *Widgeon,* 300 Md. at 523, 534, 479 A.2d 921 (doctors employed by

---

12. The Court of Appeals speculated in *Waldron, supra,* that it may be "because this State has no express equal protection clause that Article 24 has been interpreted to apply in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution." 289 Md. at 704, 426 A.2d 929 (internal quotation marks omitted).

the State of Maryland who concluded that plaintiff suffered from a mental disorder and committed him to a hospital); *Mason v. Wrightson,* 205 Md. 481, 485, 109 A.2d 128 (1954) (Baltimore City Police Sergeant); *Heinze v. Murphy,* 180 Md. 423, 425, 24 A.2d 917 (1942) (Baltimore City Police Officer); *Gibson,* 110 Md. at 653–54, 73 A. 261 (Warden of the Maryland Penitentiary). The Court of Appeals has not defined the terms "public officials" and "under color of office" in context, but in the absence of contrary interpretation, such status-based terms seem to limit the reach of Maryland's equal protection guarantees to State or local governmental employees purporting to act in an official capacity. Such a construction would be far less protective than the relatively well-developed Supreme Court state action jurisprudence, which recognizes that state action may exist even though the actor is not a governmental employee.

 We conclude that a distinct Maryland constitutional analog to the federal state action analysis has never been articulated and that Maryland precedents have not excluded, by negative implication, the consideration of federal state action jurisprudence in the development of similar Maryland principles. Consequently, we shall begin by analyzing the actions of appellee Ovid and the union appellees as alleged in the amended complaint to determine whether those actions amount to state action under Supreme Court precedent.[13]

In *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the Supreme Court said the following of the state action doctrine:

---

**13.** In Part 1.A., above, we concluded that the factual allegations of the amended complaint were insufficient to support an inference that appellees Parsons and Moragne-el discriminated against appellant because of her sex, as required to state a cause of action under Title VII. For the same reasons, the amended complaint fails to state an Article 24 equal protection violation against Parsons and Moragne-el.

Moreover, we discussed above appellant's allegation that the union appellees agreed with her supervisors at MTA that she "would lose a day's work." We do not take this ambiguous statement as an allegation that appellant was denied any right or benefit in violation of her equal protection rights.

It is clear, as it always has been since the *Civil Rights Cases* [109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883) ], that "Individual invasion of individual rights is not the subject-matter of the [Fourteenth] amendment," at p. 11, 3 S.Ct. 18, and that private conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to have become involved in it. Because the virtue of the right to equal protection of the laws could lie only in the breadth of its application, its constitutional assurance was reserved in terms whose imprecision was necessary if the right were to be enjoyed in the variety of individual-state relationships which the Amendment was designed to embrace. For the same reason, to fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an "impossible task" which "This Court has never attempted." *Kotch v. Pilot Comm'rs*, 330 U.S. 552, 556, 67 S.Ct. 910, 91 L.Ed. 1093 [ (1947) ].

Although the Supreme Court has not formulated a precise test, the Court has articulated several approaches to the state action problem. In *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), the respondent creditor had successfully petitioned for a writ of attachment under Virginia law to prevent the petitioner, its debtor, from disposing of his property before the debt could be adjudicated. 457 U.S. at 924, 102 S.Ct. 2744. The writ of attachment was executed by a county sheriff, but it was dismissed at a judicial hearing conducted shortly thereafter. *Id.* at 924–25, 102 S.Ct. 2744. The petitioner then brought an action against the respondent alleging, among other things, that respondent had acted with the State to violate petitioner's due process rights. *Id.* at 925, 102 S.Ct. 2744. In separate counts, petitioner alleged both that respondent had misused Virginia procedure in violation of his due process rights and that due process was violated by the application of the statutory attachment procedure itself. *Id.*

The Court announced a "two-part approach" to determining whether the alleged constitutional deprivations could be attributed to the State:

First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.

*Id.* at 937, 102 S.Ct. 2744. The Court stated that the two principles "collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decisions" but that the principles diverge "when the constitutional claim is directed against a party without such apparent authority, *i.e.,* against a private party." *Id.* The Court applied the two-part approach to the facts before it, and concluded (1) that state action was not implicated in the misuse of Virginia procedure count because the allegations of unlawful activity presupposed actions contrary to governmental policy and without the purported authority of the State of Virginia, but (2) that the attachment procedure outlined in the Virginia statute was the product of state action. *See id.* at 940–42, 102 S.Ct. 2744.

The *Lugar* Court explained in a footnote that its decision was consistent with the preceding case of *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), decided the same term. In *Polk County,* the Court held that a public defender's actions in representing a defendant in a state criminal proceeding could not be actions "under color of state law" in a § 1983 suit. *See Polk County,* 454 U.S. at 317–19, 102 S.Ct. 445. The Court reached this conclusion in part by giving more weight to the function performed by the public defender in the adversarial process than to the status of the public defender as a state employee. *See id.* at 320, 102 S.Ct. 445. After detailing the many duties traditionally performed by a public defender while acting as an advocate, the Court concluded, "We find it peculiarly difficult to detect any color of

state law in such activities." *Id.* Although in *Polk County* the Court found it unnecessary to consider the comparative scope of the state action and color of state law inquiries, *id.* at 322 n. 12, 102 S.Ct. 445, in *Lugar* it held that the "under-color-of-state-law requirement" is broader than the state action requirement, such that "conduct satisfying the state-action requirement of the Fourteenth Amendment satisfies the statutory requirement of action under color of state law," while the reverse is not true. *Lugar,* 457 U.S. at 935 n. 18, 102 S.Ct. 2744. Thus, the representation of criminal defendants held unassailable under § 1983 in *Polk County* similarly would not constitute state action.

 We find these cases instructive in analyzing whether the alleged actions of Ovid and the union appellees could trigger the equal protection concept of Article 24 of the Maryland Declaration of Rights. The amended complaint does not allege that the union appellees were State employees, or that the State was responsible for their actions, but instead alleges that they were officials of the "Local 1300." It is patent that the union assumes an adversarial role with respect to the MTA and the State when it represents union members in employment matters. Beyond the bare allegation that the three union appellees "did nothing to stop [the harassment] and participated in the same," appellant alleges that she met with the officials in October of, we presume, the year 1995; that at this meeting she told the union appellees Ovid had elbowed her; that they attempted to convince her to change her internal report to omit the allegations that Ovid elbowed her and sexually harassed her; and that the union appellees denied her a hearing and did not properly process her grievance. Finally, appellant alleges that her supervisors at MTA agreed with the union appellees' decision to deny her a hearing on her internal complaint and that the union appellees agreed with her supervisors that she "would lose a day's work."

As a preliminary matter, we note that appellant does not identify the manner in which the union appellees subjected her

to disparate treatment in violation of equal protection. In the amended complaint, appellant did not allege that she was treated differently than others in the handling of her grievance or in her contact with the union officials. Moreover, if the union appellees did subject her to disparate treatment, it could not be inferred from the alleged facts that she endured such treatment because of her sex, and appellant does not make such an allegation.[14] Finally, even if appellant had satisfied the above deficiencies, she does not allege or plead facts to support the conclusion that the union appellees, as private actors for whom the State was not responsible, deprived her of those rights by the exercise of some right or privilege created by the State, or by a rule of conduct imposed by the State. The allegation of an "agreement" between the Union appellees and appellant's MTA supervisors to deny appellant a hearing does not transform the union's alleged decision into state action. Thus, the alleged actions of the union appellees fail to satisfy the first part of the *Lugar* state action approach. For all of the above reasons, the amended complaint fails to state a cause of action against the union appellees for violating appellant's State right to equal protection under Article 24.

Ovid's status as a State employee, however, satisfies the first requirement under *Lugar*, that the alleged constitutional deprivation be caused by "a person for whom the State is responsible." We assume, for the purposes of our analysis, that a State equal protection violation by Ovid was otherwise sufficiently alleged in the amended complaint. We conclude, however, that, given those allegations, Ovid can not fairly be considered a state actor.

There is no question that, normally, when executive branch employees act or purport to act within the scope of their official duties, they are state actors for purposes of

---

14. The facts of the amended complaint do not support an inference that the union appellees were responsible in any way for the alleged conduct of Ovid. All specific allegations regarding Ovid's conduct apparently predate appellant's meeting with the union appellees.

constitutional analysis. *See Lugar,* 457 U.S. at 937, 102 S.Ct. 2744; 2 Chester James Antieau & William J. Rich, *Modern Constitution Law* § 26.00, at 21 (2d ed.1997). In the present case, there is no indication that Ovid's "official character" was such as to "lend the weight of the State to his decisions," of which appellant complains. Appellant does not contend that Ovid violated her rights in his official capacity as a bus cleaner. Yet, if Ovid acted as a private party, his actions were clearly contrary to State policy. *Cf. Lugar,* 457 U.S. at 940, 102 S.Ct. 2744. The amended complaint alleges privately motivated conduct that is unrelated to Ovid's official duties and not otherwise sanctioned by the State. The Fourteenth Amendment does not reach such conduct and, we are persuaded, Article 24 of the Maryland Declaration of Rights does not reach it as well.

### 3.

With respect to the false imprisonment claim against Ovid in Count II, appellant provided fragments of alleged conduct by Ovid that apparently occurred on different occasions. Appellant alleged that, while she was on a bus, Ovid told her that she could not get away from him. Appellant alleged that "Ovid would get on the bus where [she] was working, and turn the lights off and lock the back."

■ To state a cause of action for false imprisonment, it is necessary to allege an unlawful "deprivation by one person of the liberty of another without his consent, whether by violence, threat or otherwise." *Mahan v. Adam,* 144 Md. 355, 365, 124 A. 901 (1924). *See also Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 173, 122 A.2d 457 (1956); *Mason v. Wrightson,* 205 Md. 481, 487, 109 A.2d 128 (1954).

■ Appellant does not allege that on any particular occasion Ovid unlawfully deprived her of her liberty, without consent. It is insufficient that on one occasion he allegedly told her she could not get away. We therefore affirm the circuit court's dismissal of Count II.

### 4.

Appellant asserted in Count XI of the amended complaint violations of 42 U.S.C. § 13981, known as the Civil Rights Remedies for Gender–Motivated Violence Act (VAWA). The Act declares that "[a]ll persons . . . shall have the right to be free from crimes of violence motivated by gender. . . ." 42 U.S.C. § 13981(c) (1994). Subsection (c) creates civil liability for violations. In subsection (d)(2)(A), the term "crime of violence" is defined in part as "an act or series of acts that would constitute a felony against the person . . . and that would come within the meaning of State or Federal offenses." The alleged acts need not have actually resulted in criminal charges or prosecution. *Id.* § 13981(d)(2)(A).

■ Appellant did not identify in the amended complaint, and does not identify in her brief, a specific crime of violence to support a violation of the statute. We note that appellant's allegations of civil battery by Ovid would not satisfy the elements of the felony of first degree assault under Maryland Law.[15] Although Count XI incorporates all other paragraphs of the amended complaint, we conclude that the pleading does not allege facts that would constitute a felony by Ovid, Parsons, or Moragne-el under Maryland law. Consequently, we affirm the dismissal of Count XI.[16]

---

**15.** The felony of first degree assault is committed when a person causes or attempts to cause another "serious physical injury," or commits an assault with a firearm. Md.Code (1957, 1996 Cum.Supp.), Art. 27 § 12A–1. The term "serious physical injury" is defined as physical injury which:
 (1) Creates a substantial risk of death;
 (2) Causes serious permanent or serious protracted disfigurement;
 (3) Causes serious permanent or serious protracted loss of the function of any bodily member or organ; or
 (4) Causes serious permanent or serious protracted impairment of the function of any bodily member or organ.
Md.Code (1957, 1996 Cum.Supp.), Art. 27 § 12(c).

**16.** Because we affirm the dismissal of Count XI on this basis, we do not reach appellees' contentions regarding (1) the potential preclusive effect of the acquittal of Ovid on the civil battery count, (2) the requirement of the VAWA that the "crime of violence" relate to or be motivated by animus against women, (3) the argument that state employees sued in

**5.**

Appellant's allegations with respect to the unnumbered intentional infliction of emotional distress claim are insufficient to state a cause of action. In *Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977), the Court of Appeals recognized the tort of intentional infliction of emotional distress and listed its four elements as follows:

(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress;

(4) The emotional distress must be severe.

*Harris,* 281 Md. at 566, 380 A.2d 611. In concluding that the evidence in *Harris* offered in support of the fourth element was legally insufficient, the Court stated: "That element of the tort requires the plaintiff to show that he suffered a *severely* disabling emotional response to the defendant's conduct. The severity of the emotional distress is not only relevant to the amount of recovery, but is a necessary element to any recovery." *Id.* at 570, 380 A.2d 611. The Court concluded in part that the proffered evidence lacked necessary "evidentiary particulars" of the severity of the emotional distress other than that the plaintiff had seen a physician on one occasion "for his nerves." *Id.* at 572, 380 A.2d 611. *Compare Caldor, Inc. v. Bowden*, 330 Md. 632, 642, 625 A.2d 959 (1993) (allegations that plaintiff was "distraught," did not socialize as much after the incident, "kept to himself, and did not trust others very readily," but carried on with his normal activities and obtained employment soon after the incident, held insufficient evidence of either a "severely disabling emotional response that hindered his ability to carry out his daily activities or the severe emotional distress this cause of action requires") *with Moniodis v. Cook*, 64 Md.App. 1, 16, 494 A.2d 212 (1985)

their official capacity are not "persons" within the meaning of the VAWA, and (4) the fact that the VAWA was held unconstitutional by the Fourth Circuit in *Brzonkala v. Virginia Polytechnic Inst. and State Univ.,* 169 F.3d 820 (4 th Cir.1999) (en banc).

(after the incident, plaintiff took increasing amounts of medication, "began to sleep most of the time," "became a recluse" for one year, and relied on relatives to tend to her household chores), *superseded by statute on other grounds as stated in Weathersby v. Kentucky Fried Chicken Nat. Management Co.*, 86 Md.App. 533, 587 A.2d 569 (1991), *rev'd on other grounds*, 326 Md. 663, 607 A.2d 8 (1992).

In *Leese v. Baltimore County*, 64 Md.App. 442, 497 A.2d 159 (1985), *overruled in part on other grounds by Harford County v. Town of Bel Air*, 348 Md. 363, 704 A.2d 421 (1998), we affirmed the dismissal of a claim for intentional infliction of emotional distress in part because the plaintiff's declaration failed to allege " 'a *severely* disabling emotional response,' so acute that 'no reasonable man could be expected to endure it.' " *Leese*, 64 Md.App. at 471, 497 A.2d 159 (quoting *Harris*, 281 Md. at 571, 380 A.2d 611). We concluded that the plaintiff's allegation that he "suffered 'physical pain, emotional suffering and great mental anguish,' " fell short of the " 'evidentiary particulars' that must be pleaded to show a *prima facie* case of severe injury." *Id.* at 472, 497 A.2d 159. We noted that the plaintiff did not allege that he was "unable to tend to necessary matters," but that he did allege that he was actively job hunting after the incident. *Id.*

▮▮▮ In the present case, appellant alleged that "MTA, Ovid, Parsons, Moragne-el, Pettus, Fonder, and Zollicoffer engaged in a continuing pattern of intentional and reckless conduct, that was extreme and outrageous, causing Ms. Manikhi severe emotional distress." Appellant alleged that the appellees' acts "caused Ms. Manikhi to seek medical treatment." These allegations fall short of the requirement that emotional distress be plead with particularity. Instead, particular facts presented in the amended complaint suggest that appellant continued to work during and after the alleged incidents. Without specific allegations of fact detailing appellant's "severe emotional distress," the amended complaint failed to state a claim for intentional infliction of emotional distress.

■ With respect to aiding and abetting, Count III, and conspiracy, Count IV, we conclude that no underlying tort remains to support the liability of any appellee under these Counts. In *Alleco Inc. v. The Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 665 A.2d 1038 (1995), the Court of Appeals considered whether both aiding and abetting and civil conspiracy were sufficiently alleged in the amended complaint. The Court stated, "This Court has consistently held that 'conspiracy is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.'" *Alleco Inc.*, 340 Md. at 189, 665 A.2d 1038 (quoting *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 645 n. 8, 650 A.2d 260 (1994)). Similarly, the Court stated:

> One of the requirements for tort liability as an aider and abettor is that there be a "direct perpetrator of the tort." *Duke v. Feldman* [245 Md. 454, 457, 226 A.2d 345 (1967)]. Thus, civil aider and abettor liability, somewhat like civil conspiracy, requires that there exist underlying tortious activity in order for the alleged aider and abettor to be held liable.

*Alleco Inc.*, 340 Md. at 200–01, 665 A.2d 1038. Concluding that no underlying tort was plead in that case, the Court affirmed the dismissal of the amended complaint on that ground.

We reach an analogous conclusion in the case at bar. Every tort alleged in the amended complaint was dismissed by the circuit court. We have affirmed the dismissal of those torts the dismissal of which appellant contends was error. No tort remains to support aider and abettor or conspiratorial liability as to any of the appellees. We therefore affirm the dismissal of Counts III and IV.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**