758 A.2d 616

**Russell J. CAMPBELL**

v.

**Patricia K. CUSHWA, Chairperson, et al.**

**No. 1579, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Aug. 31, 2000.

522

524

Russell J. Campbell, Westover, for appellant.

Gloria Wilson Shelton, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellees.

Submitted before HOLLANDER, KENNEY and THEODORE G. BLOOM (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

This appeal arises from a suit filed on July 13, 1998, in the Circuit Court for Somerset County, by Russell J. Campbell, appellant, *pro se,* against Patricia K. Cushwa, Chair of the Maryland Parole Commission; Richard A. Lanham Sr., Commissioner of the Division of Correction ("DOC"); and Melanie C. Pereira, former Deputy Commissioner of Corrections, appellees. Appellant, a prison inmate, alleged that, in retaliation for lawsuits, grievances, and administrative complaints filed by him, appellees repeatedly refused to decrease his security classification or grant parole, in violation of his constitutional

rights. Relying on 42 U.S.C. § 1983 (1994, Supp. III 1997), he sought declaratory, injunctive, and monetary relief. In response, appellees filed a motion to dismiss for failure to state a claim. On September 3, 1998, the court granted appellees' motion. Thereafter, appellant noted this appeal. He presents two issues for our review, which we have condensed and rephrased:

Did the trial judge err in granting appellees' motion to dismiss for failure to state a claim?

For the reasons discussed below, we shall affirm.

## FACTUAL SUMMARY

At the relevant time, appellant was an inmate incarcerated at the Eastern Correctional Institution ("ECI") in Westover, serving a forty-five year sentence for murder.[1] At the time of suit, he was classified as a medium security prisoner. In appellant's complaint, he alleged, *inter alia*, violations of the Ex Post Facto Clause, the Equal Protection Clause, and the Due Process Clause of the Federal Constitution, as well as the deprivation of other rights protected by the First, Fifth, Eighth, and Fourteenth Amendments. Appellant contended that appellees retaliated against him by repeatedly refusing to reduce his security classification, and he claimed that the "failure to lower his security status has ... effectively denied him any form of meaningful opportunity for parole...."

According to appellant, he initially appeared before the "reclassification team" at Brockbridge Correctional Facility ("Brockbridge") on December 27, 1995, at which time the team recommended a decrease in appellant's security status to "Pre–Release Outside Detail." Although the reclassification was approved by the Warden, Pereira allegedly decided to "place the reclassification recommendation on hold," pending a March 1996 Parole Commission hearing. Appellant claimed

---

1. The record before us does not include precise information about appellant's conviction or sentence. Therefore, we rely on information provided by the parties in their briefs.

that the Parole Commission was advised of Brockbridge's decision on March 18, 1996, and "gave [appellant] a 12 month (one year) set off with an additional recommendation of 'outside' work detail and subsequent work release." Appellant again appeared before the "reclassification team" at Brockbridge on June 25, 1996, and received another favorable recommendation. Appellant further alleged that his case manager informed him that his reclassification had been "Approved." Appellant asserted, however, that, as a result of a grievance letter he submitted to Pereira on July 10, 1996, relating to matters he raised as early as 1994, his pre-release status was "Disapproved." Subsequently, he was transferred to the Jessup Pre–Release Unit and, on October 1, 1996, he appeared before the reclassification unit there. Although a reduction in classification was recommended, it was also "Disapproved."

Appellant further asserted that, because of an institutional infraction allegedly committed by him in October 1996, he lost his "Min., security status." When the adjustment infraction was reversed following an inmate grievance hearing, his security status was not restored. Consequently, appellant complained of appellees' "arbitrary and capricious abuse of discretion" in the "application of [DOC Directive] 100–1, . . . totally without penological justification and in retaliation for his successful prior litigations and formal complaints." Moreover, in February 1998, after appellant appeared for a reclassification hearing, the reclassification team recommended minimum security status, but "the Commissioner's Office" did not approve the recommendation.

In his complaint, appellant stated that the DOC's "repeated denial of recommended security status . . . has in fact increased the punishment for his criminal offense" and effectively denied him "any form of meaningful opportunity for parole in violation of the Ex Post Facto Clause." Further, he alleged that appellees' refusal to lower his security classification, "without psychological justification or reasonable public safety concerns, and the Parole Commission's refusal to recommend parole without lower security classification, each with knowl-

edge of the other, amount[s] to 'mental *torture in violation of the Eighth and Fourteenth Amendment's prohibition on cruel and [un]ususal punishment.*' "

As we noted, appellees moved to dismiss for failure to state a claim. They asserted that security classifications "in and of themselves do not constitute ex post facto punishment," and that the "speculative possibility" of a delay in appellant's prospect for parole does not constitute an ex post facto violation. Appellees also relied on the doctrines of sovereign immunity, public official immunity, and State employee immunity.

In his opposition to the motion, appellant alleged that he had a parole re-hearing in March 1998, at which time two Parole Commissioners recommended that he receive "a one (1) year set off with a recommendation of 'work release and [l]esser security,' " but that the application of [DOC Directive] 100–508, which became effective in February 1997, made the Commissioners' decision "meaningless without [approval for] an appropriate delayed release" date. In appellant's view, these actions violated his " 'clearly established' ex post facto rights."

## PROCEDURAL BACKGROUND

In Maryland, the DOC is responsible for the operation of the State's penal system. *See* Md.Code (1999), §§ 3–203, 3–205 of the Correctional Services Article ("C.S."). DOC Directive ("DCD") 100–005.II.B provides: "In classifying inmates committed to its custody, the Division of Correction requires consideration of case data, inmate participation, and hierarchical review. *Inmates shall be classified to the least restrictive security level consistent with their needs, public safety, and the safety and orderly operation of the Division's facilities.*" (Emphasis added). The DOC operates institutions in four security levels: Maximum, medium, minimum, and pre-release. DCD 110–12.IV.2.

As we noted, at the relevant time appellant was classified in the medium security category. Medium security institutions

provide "secure housing ... for inmates who pose some risk of violence, may be escape risks, or have a limited history of institutional disciplinary problems." DCD 110–12.IV.2.b. According to DCD 110–12.2.c, "Minimum security facilities have fewer security features [than medium security] for inmates who pose less risk of violence or escape and who have a minimal history of disciplinary problems." "Pre-release" is the least restrictive category. DCD 110–12.2.d provides: "Pre-release security facilities have the fewest security features for inmates who present the least risk of violence and escape and who have a record of satisfactory institutional behavior."

The procedure for the reclassification of the security status of an inmate is contained in DCD 100–102, issued on January 16, 1996. An institutional score is used to determine whether a change in security is approved. *See* Appendix 1 to DCD 100–102.D.15. DCD 100–102.II.A provides: "An inmate who is in medium security and has an exclusion which would prohibit his/her reduction below medium security status ... shall have his/her annual review by completing [two sections] of the Security Reclassification Instrument, Form DC[D] 100–102a...." Appendix 2 to DCD 100–102 is entitled "Security Reclassification Instrument" (the "Instrument"). Section A of Appendix 2, entitled "Exclusionary Offender," lists seven categories of offenses: 1) Life/Death; 2) Rape/Sex Offense; 3) Child Abuse; 4) Escape History; 5) New Criminal Offense in DOC; 6) 4X 643B [2]; 7) No Pre–Release. Section B of the Instrument is entitled "Security Assessment." Section B, subsection 1 sets forth seven categories for which points are added to an inmate's score based on the "most severe current offense." In the "Security Assessment," points are also based on the inmate's total term of incarceration, type of detainer/documented pending charge, prior incarcerations, history of escape attempts, and history of violence. Pursuant to Section C of the Instrument, entitled "Institutional Assessment," an

---

2. Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 643B provides for "Mandatory sentences for crimes of violence."

inmate who is not an exclusionary offender obtains an institutional score that is used to determine the recommendation for reclassification.

The Parole Commission has "exclusive power" to authorize parole. C.S. § 7–205(a); Code of Maryland Regulations ("COMAR") 12.08.01.18(A)(1). The warden reviews and signs all recommendations. DCD 100–102, App. 1 at D.22. An inmate sentenced to the custody of the DOC for the commission of a violent crime on or after October 1994 is not eligible for parole until the inmate has served the greater of one-half of the aggregate sentence for violent crimes or a quarter of the inmate's total aggregate sentence. C.S. § 7–301(c)(1) & (2). Further, "[r]elease on parole may not be granted unless recommended by a hearing examiner and approved by a parole commissioner...." COMAR 12.08.01.18(D)(1).

C.S. § 7–305 delineates the factors to be considered by the Commission in determining whether an inmate is suitable for parole. The statute provides:

### § 7–305. Factors and information to be considered.

Each hearing examiner and commissioner determining whether an inmate is suitable for parole, and the Commission before entering into a predetermined parole release agreement, shall consider:

(1) the circumstances surrounding the crime;

(2) the physical, mental, and moral qualifications of the inmate;

(3) the progress of the inmate during confinement, including the academic progress of the inmate in the mandatory education program required under § 22–102 of the Education Article;

(4) whether there is reasonable probability that the inmate, if released on parole, will remain at liberty without violating the law;

(5) whether release of the inmate on parole is compatible with the welfare of society;

(6) an updated victim impact statement or recommendation prepared under § 7–801 of this title;

(7) any recommendation made by the sentencing judge at the time of sentencing;

(8) any information that is presented to a commissioner at a meeting with the victim; and

(9) any testimony presented to the Commission by the victim or the victim's designated representative under § 7–801 of this title.

In addition, COMAR 12.08.01.18(A) states, in pertinent part:

(1) In determining whether a prisoner is suitable for release on parole, the Commission considers:

(a) The circumstances surrounding the crime;

(b) The physical, mental, and moral qualifications of persons who become eligible for parole;

(c) Whether there is reasonable probability that the prisoner, if released on parole, will remain at liberty without violating the laws; and

(d) Whether the release of the prisoner on parole is compatible with the welfare of society.

(2) The Commission also considers the following criteria:

(a) Whether there is substantial risk the individual will not conform to the conditions of parole;

(b) Whether release at the time would depreciate the seriousness of the individual's crime or promote disrespect for the law;

(c) Whether the individual's release would have an adverse affect on institutional discipline;

(d) Whether the individual's continued incarceration will substantially enhance his ability to lead a law abiding life when released at a later date.

(3) To make these determinations the Commission examines:

(a) The offender's prior criminal and juvenile record and his response to prior incarceration, parole or probation, or both;

(b) The offender's behavior and adjustment and his participation in institutional and self-help programs;

(c) The offender's vocational, educational, and other training;

(d) The offender's current attitude toward society, discipline, and other authority, etc.;

(e) The offender's past use of narcotics, alcohol, or dangerous controlled substances;

(f) Whether the offender has demonstrated emotional maturity and insight into his problems;

(g) Any reports or recommendations made by the sentencing judge, the institutional staff, or by a professional consultant such as a physician, psychologist, or psychiatrist;

(h) The offender's employment plans, his occupational skills, and his job potential;

(i) The offender's family status and stability;

(j) The offender's ability and readiness to assume obligations and undertake responsibilities;

(k) The adequacy of the offender's parole plan and the availability of resources to assist him;

(l) Any other factors or information which the Commission may find relevant to the individual offender's consideration for parole.

Moreover, if an inmate is approved for parole and is then convicted of an infraction or reclassified to greater security, a case management supervisor makes a report to the Commission. COMAR 12.02.06.03(F)(4) provides that, following receipt of the report, "the Commission may take whatever action is deemed appropriate, including suspending the decision to approve and scheduling the inmate for another hearing, after which the Commission may:

(a) Rescind the decision to approve;

(b) Extend the date of parole release; or

(c) Affirm the decision to approve."

Work release is generally available to an eligible inmate who can enter the community with minimal risk to public

safety. COMAR 12.02.12.01(A). Work release is considered a privilege intended to prepare eligible persons to function in the community. *See* C.S. § 3-801(b). In order to qualify for work release, an inmate must have attained minimum security or pre-release status for at least thirty consecutive days. *See* DCD 100–508.III.A. Further, DCD 100–508.III.B states that "[a]n inmate incarcerated for a crime of violence shall be within eight months of a definite release date" before becoming eligible for work release. In addition, DCD 100–005.II.P.4 provides that "an inmate who has been convicted of a new criminal offense committed during the present incarceration" can not be classified below medium security "unless approved for a delayed parole release . . . or unless within one year of a mandatory supervision release date or maximum expiration release date." In any event, the Commissioner has the discretion to approve, disapprove, or defer action on an inmate's work release status. C.S. § 3-801(d)(2).

An increase in an inmate's security classification reduces his opportunity for parole or work release. An inmate who is not classified .as minimum security is subject to reclassification every twelve months. *See* DCD 100–005.II.N.3.a. DCD 100–005.II.T expressly authorizes the Commissioner to modify an inmate's security classification "at any time for any reason." Specifically, the provision states:

Notwithstanding the provisions of this or any other directive and consistent with the law, the Commissioner and those authorized by the Commissioner have the absolute discretion to modify, suspend, or terminate the case management process for any reason. Similarly, the Commissioner or the Commissioner's designees retain the discretion to modify the classification and/or assignment of any inmate at any time for any reason.

## DISCUSSION

### I.

Appellant argues that the trial court erred when it granted appellees' motion to dismiss because his complaint adequately

alleged "a chronology of events from which retaliation [for his filing of lawsuits and grievances] may be inferred." Appellees counter that appellant's claims lack merit because he failed to allege a deprivation of either constitutional or statutory rights that entitled him to relief.

The grant of a motion to dismiss is only proper when the complaint does not disclose, on its face, a legally sufficient cause of action. *Hrehorovich v. Harbor Hosp. Ctr., Inc.,* 93 Md.App. 772, 785, 614 A.2d 1021 (1992), *cert. denied,* 330 Md. 319, 624 A.2d 490 (1993). In considering a motion to dismiss for failure to state a claim under Rule 2-322(b)(2), a court must assume the truth of all well pleaded facts and all reasonable inferences that may be drawn from them. *Manikhi v. Mass Transit Admin.,* 127 Md.App. 497, 510, 733 A.2d 372, *cert. denied,* 356 Md. 495, 740 A.2d 613 (1999); *Rossaki v. NUS Corp.,* 116 Md.App. 11, 18, 695 A.2d 203 (1997). The plaintiff, moreover, must allege facts with specificity; "[b]ald assertions and conclusory statements . . . will not suffice." *Bobo v. State,* 346 Md. 706, 708–09, 697 A.2d 1371 (1997) (citation omitted); *see Manikhi,* 127 Md.App. at 510, 733 A.2d 372. Thus, dismissal is proper when the facts and allegations, even if proven, "nonetheless fail to afford relief to the plaintiff." *Bobo,* 346 Md. at 709, 697 A.2d 1371 (citing *Morris v. Osmose Wood Preserving,* 340 Md. 519, 531, 667 A.2d 624 (1995)). On appeal, we "must determine whether the trial court was legally correct, examining solely the sufficiency of the pleading." *Bobo,* 346 Md. at 709, 697 A.2d 1371.

## II.

As we noted, appellant filed suit under 42 U.S.C. § 1983. Federal law governs any claims and defenses based on 42 U.S.C. § 1983. *Ritchie v. Donnelly,* 324 Md. 344, 353, 597 A.2d 432 (1991); *Davis v. DiPino,* 121 Md.App. 28, 49, 708 A.2d 357 (1998), *aff'd. in part,* 354 Md. 18, 729 A.2d 354 (1999). Generally, 42 U.S.C. § 1983 authorizes suit against a "person" who, under color of state law, deprives the plaintiff of a federally protected right. *Ritchie,* 324 Md. at 354, 597 A.2d

432; *Davis,* 121 Md.App. at 49, 708 A.2d 357. "Section 1983 does not confer any substantive rights, however." *Davis,* 121 Md.App. at 50, 708 A.2d 357 (citing *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979)). Section 1983 states, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

■■■ In order to state a claim under § 1983 claim, the following "essential elements" must be alleged: "(1) that the defendant was acting under color of state law in the actions complained of; and (2) that the defendant deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States." *Clark v. Link,* 855 F.2d 156, 161 (4th Cir.1988) (citation omitted); *see Davis,* 121 Md.App. at 50, 708 A.2d 357. "If there is no violation of a federal right, [then] there is no basis for a § 1983 action...." *Clark,* 855 F.2d at 161; *see Screws v. United States,* 325 U.S. 91, 108, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); *Mensh v. Dyer,* 956 F.2d 36, 39 (4th Cir.1991); *Clipper v. Takoma Park,* 876 F.2d 17, 19 (4th Cir.1989); *Davis,* 121 Md.App. at 50, 708 A.2d 357.

■■■ In his suit, appellant alleged that appellees violated his rights under the First Amendment. The First Amendment protects the right to free speech, which includes "the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir.2000) (citation omitted). "[B]y engaging in retaliatory acts, public officials place informal restraints on speech...." *Id.* Thus, retaliation by a public official for the exercise of a constitutional right may be actionable under § 1983. *See ACLU v. Wicomico County,* 999 F.2d 780, 785 (4th Cir.1993). Nevertheless, "not every reaction made in

response to an individual's exercise of his First Amendment right to free speech is actionable retaliation." *Suarez,* 202 F.3d at 685 (citing *DiMeglio v. Haines,* 45 F.3d 790, 806 (4th Cir.1995)). Moreover, to sustain a cause of action under 42 U.S.C. § 1983 on this basis, appellant must allege that appellees directed or participated in the alleged constitutional violations. *Rizzo v. Goode,* 423 U.S. 362, 370–71, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

The classification of prisoners is ordinarily a matter vested in the discretion of prison administration, in accordance with statute and COMAR regulations. *See Grimm v. Jackson,* 849 F.Supp. 1127, 1132–33 (W.D.Va.1994), *aff'd sub nom. Hill v. Jackson,* 64 F.3d 163 (4th Cir.1995). In order to prevail in connection with the motion to dismiss, appellant had to aver, *inter alia,* that he "suffered some adversity in response to [the] exercise of protected rights." *ACLU,* 999 F.2d at 785 (citation omitted); *see Suarez,* 202 F.3d at 685. Claims of retaliation are "legally frivolous unless the complaint implicates some right that exists under the Constitution." *Adams v. Rice,* 40 F.3d 72, 75 (4th Cir.1994), *cert. denied,* 514 U.S. 1022, 115 S.Ct. 1371, 131 L.Ed.2d 227 (1995). Any claim that fails to do so " 'lacks even an arguable basis in law.' " *Id.* (quoting *Neitzke v. Williams,* 490 U.S. 319, 328, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989)). Moreover, such claims are considered with skepticism, because " '[e]very act of discipline by prison officials is by definition "retaliatory" in the sense that it responds directly to prisoner misconduct.' " *Cochran v. Morris,* 73 F.3d 1310, 1317 (4th Cir.1996) (quoting *Adams,* 40 F.3d at 74).

Thus, in order to plead a § 1983 retaliation claim based on the First Amendment, appellant had to allege: 1) that his speech was protected; 2) that appellees' "alleged retaliatory action adversely affected [appellant's] constitutionally protected speech," *Suarez,* 202 F.3d at 686; and 3) "that a causal relationship exists between [his] speech and the [appellees'] retaliatory action." *Suarez,* 202 F.3d at 686 (citation omitted). The Fourth Circuit made clear in *Suarez* that "the

retaliatory acts committed by a public employer [must] be more than *de minimis* or trivial." *Id.* (citations omitted). The court considered the appropriate inquiry to be whether the public officials engaged in conduct that was "threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow." *Suarez,* 202 F.3d at 689 (citations omitted).

The first prong under *Suarez, supra,* requires us to determine whether appellant's grievances and complaints constituted protected speech. To be sure, appellant had a right to proceed lawfully in filing grievances against employees of the DOC. *Cavey v. Levine,* 435 F.Supp. 475, 482 (D.Md.1977), *aff'd sub nom. Cavey v. Williams,* 580 F.2d 1047 (4th Cir. 1978); *Timmerman v. Brown,* 528 F.2d 811, 815 (4th Cir. 1975). In this regard, we are mindful of what the Supreme Court said in *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974):

> We start with the familiar proposition that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285 [68 S.Ct. 1049, 92 L.Ed. 1356] (1948). *See also Cruz v. Beto,* 405 U.S. 319, 321 [92 S.Ct. 1079, 31 L.Ed.2d 263] (1972). In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

The second prong of the analysis focuses on whether the retaliatory action deprived appellant of a valuable benefit. *See Suarez,* 202 F.3d at 685; *see also ACLU,* 999 F.2d at 785 (quoting *Huang v. Board of Governors,* 902 F.2d 1134, 1140 (4th Cir.1990)). Appellant maintains, *inter alia,* that, in re-

sponse to his filing of suits and grievances, the DOC refused to lower his security classification to the level it was prior to October 1996, when a baseless rule infraction charge was lodged against him. Essentially, appellant argues that, without reasonable justification, he has been denied a meaningful opportunity for parole, pre-release, or work release. As we see it, appellant failed to allege facts showing that he suffered an adverse consequence due to appellees' alleged retaliation, or that a causal relationship existed between his speech—the filing of suits and grievances—and appellees' alleged retaliatory conduct.

██ Courts reviewing the administration of prisons and jails must give "appropriate deference to the decisions of prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). In *Robinson v. State*, 116 Md.App. 1, 695 A.2d 198 (1997), a case concerning the disciplining of inmates, we said:

> Prison is a place where "good order and discipline are paramount because of the concentration of convicted criminals.". . . The adoption and execution of prison policies are "peculiarly within the province and professional expertise of corrections officials" whose judgment should generally be deferred to by the courts. Because prison security and the safety of its population are in their hands, prison officials "must have a wide discretion in promulgating rules. . . ."

*Id.* at 9, 695 A.2d 198 (internal citations omitted); *see Bell v. Wolfish*, 441 U.S. 520, 547–548, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *see also United States v. Newby*, 11 F.3d 1143, 1145–46 (3d Cir.1993), *cert.* denied, 513 U.S. 834, 115 S.Ct. 111, 130 L.Ed.2d 58 (1994); *McCloskey v. Maryland*, 337 F.2d 72, 74 (4th Cir.1964).

*ACLU v. Wicomico County, supra*, 999 F.2d 780, is instructive. The case arose from a complaint filed by an employee of the Wicomico County Detention Center ("WCDC") concerning the treatment of African American prisoners. In connection

with the ACLU's investigation of the treatment of the prisoners, one of its employees was permitted, over a six month period, to make periodic visits to the WCDC in order to document inmate complaints. The ACLU negotiated an arrangement for its representative to make contact visits with certain prisoners, provided that she brought a letter from the ACLU requesting such access. *Id.* at 782. After an employee of the WCDC filed suit complaining that he was terminated because he made the complaints about the treatment of black prisoners, the ACLU's employee was denied access to the inmates. As a result, the ACLU filed suit, alleging a retaliation action in violation of the First Amendment. The court determined that the "[w]ithdrawal of a special accommodation ... whether or not it was done in response to [the] filing of a lawsuit, [wa]s not sufficiently adverse to [the ACLU employee or] to the ACLU to constitute retaliation." *Id.* at 785.

The case of *Adams v. Rice, supra,* 40 F.3d at 72, also provides guidance. There, a prisoner alleged that prison officials violated his constitutional rights because they retaliated against him when he sought protective custody. The court upheld the dismissal of the suit, on the ground that the complaint failed to allege how or why the appellees retaliated against the appellant; it merely asserted that the denial occurred as part of the appellees' "general scheme of retaliation." *Id.* at 75. Further, the court instructed: "Prisoners have no right ... to be held in either protective or minimum custody." *Id.* (citations omitted). The court added: "Nor are inmates constitutionally entitled to parole or its attendant administrative procedures." *Id.* See *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979)("There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."); *see also Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *O'Bar v. Pinion,* 953 F.2d 74, 84 (4th Cir.1991).

■ Thus, in order to state a valid retaliation claim, appellant was required to allege that appellees' conduct had an

adverse impact on his First Amendment rights. *Suarez*, 202 F.3d at 685; *ACLU*, 999 F.2d at 785. Appellant did not allege that, as a result of appellees' retaliatory conduct, he could not pursue or institute a lawsuit or grievance that he otherwise would have filed. Indeed, appellant's own suit indicates otherwise. Therefore, we fail to see how appellees' alleged failure to restore appellant's security classification adversely affected appellant's exercise of his First Amendment rights to file law suits or inmate grievance actions.

## III.

Campbell argues that appellees wrongfully refused to decrease his security status below medium security, which had the illegal effect of increasing the punishment for his crimes, in violation of the constitutional prohibition on ex post facto laws, embodied by Article 1, § 10 cl. 1 of the United States Constitution.[3] There is no merit to this contention.

An ex post facto law is one that punishes acts committed before a law was passed, or " ' "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." ' " *Knox v. Lanham*, 895 F.Supp. 750, 754 (D.Md.1995), (citations omitted), *aff'd sub nom. Worsham v. Lanham*, 76 F.3d 377 (4th Cir.1996); *see Lynce v. Mathis*, 519 U.S. 433, 441, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997); *Collins v. Youngblood*, 497 U.S. 37, 41–42, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990); *Plyler v. Moore*, 129 F.3d 728, 733 (4th Cir.1997), *cert. denied*, 524 U.S. 945, 118 S.Ct. 2359, 141 L.Ed.2d 727 (1998). A law violates the Ex Post Facto Clause when it applies retroactively to punish conduct that predates its enactment, to the detriment of those to whom it applies. *Lynce*, 519 U.S. at 439–42, 117 S.Ct. 891. A provision may also violate the Ex Post Facto Clause when the punishment for a crime is made more burdensome after the crime was committed. *Plyler*, 129 F.3d at 734.

---

**3.** Article 17 of the Maryland Declaration of Rights corresponds to the federal Ex Post Facto Clause.

In considering an alleged ex post facto violation, the "ultimate issue" is whether the challenged action " 'produces a sufficient risk of increasing the measure of punishment attached to the covered crimes' to warrant invalidation." *Knox*, 895 F.Supp. at 757 (quoting *California Dep't. of Corrections v. Morales*, 514 U.S. 499, 509, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995)). Laws affecting parole eligibility may fall within the scope of the Ex Post Facto Clause. *Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 663, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974); *Alston v. Robinson*, 791 F.Supp. 569, 588 (D.Md.1992). But, prison security classification changes generally do not constitute ex post facto punishment, because the changes do not alter, increase, or enhance the sentence. Rather, such classifications constitute matters of internal prison administration. *See Dyke v. Meachum*, 785 F.2d 267, 268 (10th Cir.1986). A prison regulation is valid "if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

In *Turner*, the Supreme Court articulated factors that should be considered in evaluating the reasonableness of a prison regulation, including: (1) whether there is a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; *id.* (citation omitted) (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation [that] the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) "the absence of ready alternatives." *Id.* at 90, 107 S.Ct. 2254. The Court stated that a regulation cannot be upheld if "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective must be a legitimate and neutral one." *Id.* at 89–90, 107 S.Ct. 2254.

In *Lomax v. Warden, Maryland Correctional Training Ctr.*, 356 Md. 569, 741 A.2d 476 (1999), the Court of Appeals considered whether an ex post facto violation resulted from

Governor Glendening's announced policy in 1995 not to approve parole for inmates serving life sentences, unless they were old or terminally ill. *Id.* at 577, 741 A.2d 476. The Court concluded that no ex post facto violation resulted from the Governor's statement that, in his discretion, he would not grant parole to "lifers."

The Court acknowledged that, for purposes of the prohibition, a "law" may include some administrative regulations. *Id.* at 576, 741 A.2d 476. The Court reiterated, however, that "the ex post facto clauses are inapplicable to 'parole guidelines [that] "do not have the force and effect of law" but are merely "polic[ies] ... that show how ... discretion is likely to be exercised." ' " *Id.* (citations omitted); *see Herrera v. State,* 357 Md. 186, 188, 742 A.2d 517 (1999); *State v. Kanaras,* 357 Md. 170, 184–85, 742 A.2d 508 (1999); *see also Gluckstern v. Sutton,* 319 Md. 634, 671–72, 574 A.2d 898, *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990). The Court determined, however, that the Governor's policy did not constitute a "law." Rather, it constituted "an announcement of guidelines as to how the Governor would exercise the [statutory] discretion which he has under the law. The Governor's announcement did not bind him, and he can employ different guidelines whenever he desires to do so." *Lomax,* 356 Md. at 577, 741 A.2d 476. In contrast, the Court observed that the Parole Commission has a statutory obligation to submit to the Governor the names of those inmates it finds suitable for parole. *Id.* at 579–80, 741 A.2d 476.

The case of *Knox v. Lanham, supra,* 895 F.Supp. 750, is also instructive. In *Knox,* the appellants claimed that a DCD directive placing inmates serving life sentences in a higher security classification, combined with the Parole Commission's refusal to recommend them for parole unless on active work release, constituted an ex post facto law. *Id.* at 753–54. The inmates asserted that the interaction of the directive and the Commission's policy "effectively den[ied] them a 'meaningful opportunity for parole.' " *Id.* at 757. The court concluded that the Parole Commission's policy to deny parole to "lifers," in conjunction with the DOC rule denying "lifers" the opportu-

nity to progress to work release, violated the ex post facto prohibition. The court reasoned that "the effect of the interaction between the mandatory medium security classification and the Parole Commission's unwritten requirement of work release ... before recommending parole, far from creating a 'speculative and attenuated risk of increasing the measure of punishment attached to' [the appellants'] crimes, directly impacts upon their actual eligibility for parole." *Id.* at 758. The court also noted that even though inmates serving life sentences are rarely granted parole, "that rare opportunity" was taken from them and "foreclose[d] lifers from ever being able to obtain parole." *Id.* Thus, the Court said: "Law is not sophistry; constitutional mandates cannot be avoided and individual rights violated by exalting form over substance. Because of its inflexibility, the Parole Commission's parole recommendation policy ... is therefore a law for ex post facto purposes." *Id.* at 756.

*Faruq v. Herndon*, 831 F.Supp. 1262, 1281 (D.Md.1993), *aff'd. sub nom. Briscoe v. Herndon*, 56 F.3d 60 (4th Cir.1995), also provides guidance. There, the appellants alleged that their delayed progression to a lower security status wrongfully delayed their consideration for parole. They argued that the Ex Post Facto Clause precluded the State from retroactive application of a security classification system that made it more difficult for inmates to progress to minimum security and work release and, eventually, to obtain parole. *Id.* at 1263.

The court noted that within the federal circuits the determination of whether a regulation is legislative requires an evaluation of whether the regulation permits the exercise of discretion to such a degree that it may properly be considered a guideline and not a binding law. *Id.* at 1279. The court reasoned that the regulations in issue were not laws, because they provided for the exercise of discretion by DOC classification teams. *Id.* at 1280. As the teams were not required to follow recommendations "rigidly and inflexibly," the court stated that "the frequency with which the [DOC Regulations]

are followed d[id] not convert the [DOC Regulations] into laws." *Id.*

Moreover, the inmates failed to convince the court because they could not demonstrate a causal nexus between classification security levels and release on parole. *Id.* at 1281. The court pointed out that progress through security levels and experience in the work release program were not dispositive, but were just two of many factors used to evaluate an inmate's readiness for parole. *Id.* In addition, the Parole Commission had discretion with respect to "individualized determinations [that were] made on a case-by-case basis." *Id.* at 1282. The court explained: "Not only is there discretion in the DOC as to classification, there is also discretion in the Parole Commission and in the Governor as to release on parole." *Id.*

The case of *Alston v. Robinson, supra,* 791 F.Supp. 569, is also helpful. There, the regulation in issue required, *inter alia,* an increased number of review board members to approve work release and parole. The regulation also required victim notification and the approval of the Secretary of Public Safety prior to reinstatement of suspended work release privileges. *Id.* at 591–92. The appellants complained that the requirements would impermissibly delay reinstatement by approximately six months. *Id.* at 591. The court found that the Ex Post Facto Clause was not implicated, however, because the requirements did not alter the criteria to determine eligibility and the changes were procedural. *Id.* at 590. As long as the Secretary and the review board acted in "good faith" and did not use the need for victim impact information or secretarial approval as a pretext for unnecessary delays, the court concluded that a "[d]elay of such length" did not implicate the Ex Post Facto Clause. *Id.* at 594 & n. 47.

It is evident that appellant's sentence remains exactly the same as on the day it was imposed, and therefore the challenged action has not increased the measure of punishment. Applying the reasoning of the above cases, the Ex Post Facto Clause is not implicated here; prison security classifications that pertain to internal administration of a prison do not

implicate the Ex Post Facto Clause, as they do not enhance a prisoner's sentence, even if they have an effect on the length of confinement. *See Dyke, supra,* 785 F.2d at 268. Moreover, the directives appellant complains about are reasonably related to legitimate penological objectives. Indeed, the Commission is not foreclosed from considering conduct that falls short of "an infraction" in determining an appropriate security classification for an inmate. An inmate's conduct, "whether labeled misconduct or not, which persuades the [Commission] that [appellant's] release w[ould] impose an unreasonable risk on society, w[ould] not only justify, but indeed compel, denial of parole." *Patuxent Inst. Bd. of Review v. Hancock,* 329 Md. 556, 598, 620 A.2d 917, *cert. denied,* 510 U.S. 905, 114 S.Ct. 284, 126 L.Ed.2d 234 (1993). Whether appellant is actually granted work release, a reduced security classification, or parole is essentially a discretionary determination. The speculative possibility that DCD 100–005.II.P will delay his release on parole is insufficient to constitute an ex post facto violation.

Pursuant to DCD 100–005.II.T, which expressly authorizes the Commissioner to modify an inmate's security classification "for any reason," appellant lacked a reasonable expectation of remaining in any given security classification status. Accordingly, appellant's security classification is not entitled to constitutional protection. *See Paoli v. Lally,* 636 F.Supp. 1252, 1257 (1986), *aff'd,* 812 F.2d 1489 (4th Cir.1987). Thus, appellees' failure to exercise their discretion so as to decrease appellant's security classification did not amount to an ex post facto violation.

### IV.

■ Appellant contends that appellees' failure to decrease his security classification violated his right to due process under the Fourteenth Amendment. We disagree.

In *Patuxent Inst. Bd. of Review v. Hancock,* 329 Md. 556, 620 A.2d 917, *cert. denied,* 510 U.S. 905, 114 S.Ct. 284, 126 L.Ed.2d 234 (1993), the Court said:

Whatever its source, in order that parole be given effect, there must be "justifiable reliance on maintaining [a] conditional freedom" instead of a "mere anticipation or hope of freedom." This is so because there is a critical and substantial difference between being deprived of a liberty one has, as in parole, and being denied a conditional liberty that one desires; "[T]here is a human difference between losing what one has and not getting what one wants."

*Id.* at 583, 620 A.2d 917 (internal citations omitted) (quoting *Greenholtz*, 442 U.S. at 10, 99 S.Ct. 2100).

In *Hansen v. Meese*, 675 F.Supp. 1482 (E.D.Va.1987), the appellant complained about a retaliatory charge of parole violations, and claimed that his arrest violated his substantive due process rights under the Fifth Amendment. The federal court stated: "Assuming that a clearly established Fifth Amendment right not to be subjected to outrageous official conduct exists, this remedy is reserved only for situations in which the actions at issue 'shock[ ] the conscience.' " *Id.* at 1488 (citations omitted). Despite the appellant's complaints of retaliation, he "was subject to the same restrictions, received the same treatment[,] and was afforded the same protections and benefits as similarly situated individuals." *Hansen*, 675 F.Supp. at 1488 (citation omitted). Thus, the conduct complained of passed the objective test of "legal reasonableness." *Id.*

In the instant case, a reclassification team recommended work release for appellant and pre-release status, but the recommendation was not approved. The warden's discretion to approve a status change did not create a constitutionally protected interest, however. *See Alston, supra,* 791 F.Supp. at 579 (citing *Holmes v. Robinson*, 84 Md.App. 144, 151–52, 578 A.2d 294 (1990), *cert. denied*, 321 Md. 501, 583 A.2d 275 (1991)) (discussing the proposition that "only mandatory language in ... regulations place[ ] sufficient limitations on official discretion to create a constitutionally protected liberty interest").

Inmates in Maryland do not have a vested right to obtain a reduction in security status because, under DCD 100–005, DOC officials have discretion in approving classification recommendations. *Paoli v. Lally, supra,* 812 F.2d at 1493. Appellant's disagreement with appellees' determination does not transform that determination into a claim for violation of his due process rights.

 Appellant did not allege in his complaint facts showing that the determination regarding appellant's security status was "arbitrary or capricious," or designed to punish appellant, "without affording to him fair procedural and substantive opportunities to present his side of the case." *Jones v. McColley,* 404 F.Supp. 350, 352 (D.Md.1975). In fact, appellant was granted several hearings. Moreover, even if appellees deviated from the security classification guidelines, appellant did not state a claim, because deviation from an agency's rules does not necessarily amount to a constitutional violation, *see Smith v. Georgia,* 684 F.2d 729, 732 n. 6 (11th Cir.1982), provided that " 'the rules of prison management ... "are necessary or reasonable concomitants of imprisonment" ' " and " 'are not exercised "in such a manner to constitute clear arbitrariness or caprice." ' " *Allgood v. Morris,* 724 F.2d 1098, 1100 (4th Cir.1984) (citation omitted).

## V.

 Appellant alleges that appellees violated his right to equal protection. This claim is unavailing.

"The Equal Protection Clause mandates that similarly situated persons be treated similarly by the government." *ACLU,* 999 F.2d at 787. Therefore, in alleging that he was denied equal protection, appellant must assert that he was treated more harshly than similarly situated inmates. *See Hansen, supra,* 675 F.Supp. at 1488. There is no allegation before us from which we may infer that appellant was subjected to harsher restrictions or treatment than were other prisoners.

## VI.

 Appellant alleges a violation of the Eighth and Fourteenth Amendments based on "mental torture" stemming from "the Commissioner's repeated refusal to lower his security classification (without any penological justification or reasonable public safety concerns), and the Parole Commission's refusal to recommend parole without [a] lower security classification...." Appellant's claim lacks merit.

 "The Eighth Amendment prohibits punishments that involve the unnecessary and wanton infliction of pain or that are grossly out of proportion to the severity of the crime, including actions that are totally without penological justification." *Knox*, 895 F.Supp. at 761 (citing *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (citations omitted)). Every governmental action affecting the interests or well-being of a prisoner, however, is not subject to Eighth Amendment scrutiny. *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). To articulate a violation of the Eighth Amendment, an inmate " 'must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.' " *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471 (4th Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 179, 145 L.Ed.2d 151 (1999) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir.1993), *cert. denied*, 510 U.S. 949, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993) (internal quotation marks omitted)). Appellant has not alleged that he has been deprived of a basic human need. Moreover, the duration of his security classification does not make it unconstitutional. Rather, it is " 'one consideration among many.' " *See Five Percenters*, 174 F.3d at 472 (citation omitted).

Here, the challenged conduct is not " 'so totally without penological justification that [it] result[s] in the gratuitous infliction of suffering.' " *Knox*, 895 F.Supp. at 761 (citation omitted). Further, the "mental torture" of which appellant complains does not rise to the level of a " 'serious or signifi-

cant physical or emotional injury,'" which is necessary to support his claim. *See Five Percenters,* 174 F.3d at 472 (quoting *Strickler,* 989 F.2d at 1381); *see also Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) ("Depression and anxiety are unfortunate concomitants of incarceration; they do not, however, typically constitute the 'extreme deprivations ... required to make out'" an Eighth Amendment claim.). Like the inmates in *Five Percenters,* 174 F.3d at 472, appellant "ha[s] failed to 'come forward with evidence from which it can be inferred that the [appellees] were ... knowingly and unreasonably disregarding an objectively intolerable risk of harm.'" *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 846, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

In view of our resolution of appellant's claims, we need not address appellees immunity defense.

**JUDGMENT AFFIRMED. COSTS WAIVED.**